|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | )Criminal No. 09-213 (EGS) |
| SHELBY LEWIS, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**MEMORANDUM OPINION**

Pending before the Court is the government's sealed motion for restitution and forfeiture against defendant Shelby Lewis, pursuant to the mandatory restitution provisions set forth in 18 U.S.C. § 1593 and the forfeiture provisions set forth in 18 U.S.C. § 1594. Upon consideration of the government's motion and defendant's opposition thereto, the sealed report of the guardian ad litem appointed to represent the four minor victims in this case and the parties' responses thereto, the parties' various supplemental filings, the expert testimony of Dr. C. David Missar, the statements made by counsel at oral argument, and the applicable law, the government's motion for restitution and forfeiture is **GRANTED** and the Court hereby **ORDERS** mandatory restitution to each of the four victims and forfeiture as set forth below.

# I. BACKGROUND

## A. Factual and Procedural Background

### 1. Indictment and Plea

On September 1, 2009, a federal grand jury returned an indictment against defendant, Shelby Lewis, charging five counts of sex trafficking of children by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a)(1), and four counts of interstate transportation of a minor for purposes of prostitution, in violation of 18 U.S.C. § 2423(a). Indictment, Doc. No. 1 ("Indictment") at 1-5. The Indictment also contained forfeiture allegations for any property used in the commission of the charged offenses and for any proceeds defendant obtained as a result of the charged offenses, including a money judgment, pursuant to 18 U.S.C. §§ 1594(b)(1)-(2) and 2428(a)(1)-(2). Indictment at 5-6.

On December 31, 2009, defendant pled guilty to four counts of violating 18 U.S.C. § 1591 (Sex Trafficking of Children). Plea Agreement, Doc. No. 5 ("Plea") at 1. Defendant admitted to prostituting four juvenile females by regularly and personally transporting them from his home in Temple Hills, Maryland into the District of Columbia for the purpose of having them engage in sex for money, which was then turned over to defendant. Statement of Facts, Doc. No. 6 ("SOF") ¶¶ 1-4. Specifically, defendant admitted that from approximately March 1, 2006 through

approximately August 2008, he prostituted S.H., beginning when she was twelve years old. SOF ¶ 1. Defendant further admitted that from approximately March 13, 2006 through approximately May 15, 2009, he prostituted T.S., who was thirteen years old at the time he began prostituting her. SOF ¶ 2. Defendant further admitted that he prostituted M.S., a sixteen-year-old girl, from approximately May 17, 2009 through approximately May 30, 2009. SOF ¶ 3. Finally, defendant admitted that he prostituted A.L., a fourteen-year-old girl, from approximately May 27, 2009 through approximately May 30, 2009. SOF ¶ 4.

In his plea agreement, defendant agreed that he understood that the Court would impose mandatory restitution for the full amount of the victims' compensable losses. Plea at 5. Defendant further agreed that he understood that the Court would impose mandatory forfeiture of any proceeds that he obtained as a result of his offenses, including a money judgment. Plea at 6. Defendant was notified that the government would seek forfeiture of certain items of his personal property, including a 2001 Ford Mustang, a 1999 Chevy Tahoe, a FIE Titan .25 caliber pistol, miscellaneous knives, a collection of antique coins, and $462 in currency. Plea at 6-7. With the exception of the automobiles and the antique coins, defendant did not contest forfeiture of these items. Plea at 7. The government represents that three items of defendant's personal property (*e.g.*, 1999 Chevy Tahoe,

2001 Ford Mustang, and FIE Titan handgun) have now been administratively forfeited.  Government's Motion for Restitution and Forfeiture ("Gov't Mot.") at 2 n.1.

On November 1, 2010, this Court sentenced defendant to 240 months of incarceration followed by a lifetime of supervised release.  Judgment, Doc. No. 30 ("Judgment") at 2-3.  The Court declined to impose a fine due to defendant's inability to pay.  Statement of Reasons, Doc. No. 31 at 1.  The Court deferred a hearing to determine a final restitution amount until January 21, 2011.  Judgment at 5.

### 2. Victims

As set forth above, defendant admitted to prostituting four juvenile females: S.H., T.S., M.S., and A.L.

### i. Victim S.H.

S.H. testified before the grand jury that she met defendant after running away from her custodial aunt when she was eleven years old.  S.H. Grand Jury Test. at 6-7.  S.H. was reportedly sleeping at a bus stop when, in the early morning hours, defendant pulled up and asked her to get in his truck, noting that he had also seen her there the previous day.  S.H. Grand Jury Test. at 9-10.  S.H. subsequently went to live with defendant and his biological children.  SOF ¶ 1.  A prostitute and stripper named "Pocahontas" also lived with them.  S.H. Grand Jury Test. at 30.  During this time, defendant was granted

temporary custody of S.H. by the Prince George's County Department of Social Services, and thus became her legal guardian. SOF ¶ 1. S.H. testified that she attended school briefly while she lived with defendant. S.H. Grand Jury Test. at 21.

The parties do not dispute that S.H. was a virgin before she met defendant, and that defendant himself was her first sexual partner, beginning on the second day after she met him. Tr., Jan. 21, 2011 at 71; *see also* S.H. Grand Jury Test. at 19, 46. S.H. testified that she had sex with defendant "almost every day" during the two-and-a-half years that she lived with him. S.H. Grand Jury Test. at 44, 47. Shortly after S.H. came to live with defendant, she also began prostituting herself in the neighborhood. S.H. Grand Jury Test. at 22-23. After seeing her out on the streets, defendant reportedly told S.H. that she "might as well come and work for him." S.H. Grand Jury Test. at 24. That same day, S.H. began working for defendant as a prostitute. S.H. Grand Jury Test. at 23-24. Defendant admitted that he prostituted S.H. from approximately March 1, 2006 through August 2008, or approximately 914 days.[1] SOF ¶ 1.

---

[1]    S.H. testified that she began working for defendant less than a year after she came to live with him. S.H. Grand Jury Test. at 22. For the purposes of calculating a restitution award, however, the Court will rely on the dates contained in the Statement of Facts, which defendant stipulated to as part of his plea agreement.

S.H. testified that defendant explained what he wanted her to do, including where to "park," how much to charge, what to say to potential clients, and how to deal with police and with other pimps. S.H. Grand Jury Test. at 25-28. While S.H. was on the streets, defendant would remain in the area, either on foot or in his vehicle, to serve as security. S.H. Grand Jury Test. at 57-58. S.H. testified that, by the end of the time she worked for defendant, she was charging $80 for intercourse, $60 for oral sex, and $120 for both, although she did accept $100. S.H. Grand Jury Test. at 25. These amounts changed depending on the length of time that she spent with the client. S.H. Grand Jury Test. at 26. S.H. testified that at the beginning of her time working for defendant, she was able to earn between $300 and $500, and those amounts increased over time. S.H. Grand Jury Test. at 33. S.H. further testified that she turned her earnings over to defendant "in the beginning." S.H. Grand Jury Test. at 29-30.

According to S.H., other girls subsequently came to live with and work for defendant. S.H. Grand Jury Test. at 35-36. S.H. had responsibility for explaining the "rules" to the new girls and collecting money from them on behalf of defendant. S.H. Grand Jury Test. at 37, 57. As such, S.H. referred to herself as defendant's "bottom b*tch," or his lead prostitute. S.H. Grand Jury Test. at 56-57. S.H. testified that she felt that she had a special relationship with defendant and that he

cared for her more than any of the other "girls." S.H. Grand
Jury Test. at 44. For this reason, when S.H. was eventually
taken away from defendant and placed in a group home, she
maintained contact with him by phone and ultimately ran away and
returned to defendant. S.H. Grand Jury Test. at 67-69. This
happened several more times, although S.H. has since maintained a
foster home placement. S.H. Grand Jury Test. at 69.

### ii. Victim T.S.

Like S.H., T.S. testified before the grand jury that she met
defendant while sleeping at a bus stop after running away from
home when she was thirteen years old. T.S. Grand Jury Test. at
7-9. T.S. testified that defendant pulled up in a vehicle, woke
her up, and offered to take her to his house. T.S. Grand Jury
Test. at 9. Two days after T.S. came to live with defendant,
defendant told T.S. she had to "go to work," which she understood
to mean working as a prostitute. T.S. Grand Jury Test. at 10.
Defendant admitted that he prostituted T.S. from March 13, 2006
through approximately May 15, 2009, or approximately 1159 days.
SOF ¶ 2.

T.S. testified that when she began working for defendant she
worked the "track"[2] with S.H., who told her what she was supposed
to do, including what to say to potential clients, how much to

---

[2]     The term "track" refers to an area where prostitutes
solicit clients. T.S. Grand Jury Test. at 11.

charge, and how to handle police or other pimps. T.S. Grand Jury Test. at 11-12. According to T.S., defendant drove them to the track and then would wait in his vehicle "to make sure nothing happened." T.S. Grand Jury Test. at 13. T.S. testified that she regularly charged $60 for oral sex, $80 for intercourse, and $100 for both, and that defendant told her she had to make at least $500 per night. T.S. Grand Jury Test. at 12. She testified that she worked seven days per week and that she made her $500 quota every night except "three or four" times in three years. T.S. Grand Jury Test. at 13. T.S. also testified that she turned the money she earned over to defendant, although she started keeping money after a period of time. T.S. Grand Jury Test. at 15. It does not appear that T.S. was enrolled in school during that time, and she testified that she has not advanced beyond the sixth grade. T.S. Grand Jury Test. at 4-5.

Less than a week after T.S. came to live with defendant, defendant began forcing T.S. to have sex with him on a weekly basis. T.S. Grand Jury Test. at 15. She further testified that defendant would choke or hit her when she refused to comply. T.S. Grand Jury Test. at 15-16. Defendant also took photographs of T.S. unclothed and put them on his computer. T.S. Grand Jury Test. at 25. T.S. testified that on three separate occasions defendant cut or stabbed her with a knife on her legs and hips, T.S. Grand Jury Test. at 16-17, and that he threatened to shoot

T.S. and to kill her friends.  T.S. Grand Jury Test. at 18-19.
T.S. testified that at one point she jumped out of defendant's
truck while it was moving in an unsuccessful attempt to escape.
T.S. Grand Jury Test. at 17.

### iii. Victim M.S.

M.S. testified before the grand jury that she met defendant
when she was sixteen years old.  M.S. Grand Jury Test. at 5.
M.S. testified that she was approached by defendant while she was
walking on her way to buy marijuana.  M.S. Grand Jury Test. at 6.
M.S. explained that defendant pulled up beside her in a vehicle
and told her that he could supply her with drugs.  M.S. Grand
Jury Test. at 6.  M.S. testified that at the time she agreed to
accompany defendant she was homeless, having run away from a
foster placement.  M.S. Grand Jury Test. at 36-37.

After M.S. got into defendant's car, defendant told her that
he was a pimp and he explained to her the "game rules" of being a
prostitute, including how much to charge and how to deal with
police and other pimps.  M.S. Grand Jury Test. at 8, 10.  That
same day, defendant had sex with M.S. so that he could know "how
much [she was] worth."  M.S. Grand Jury Test. at 16.  M.S.
testified that defendant also informed her that she would be his
"bottom b*tch," meaning that she would be responsible for
explaining the "game" to the other girls and would collect money
from them on his behalf.  M.S. Grand Jury Test. at 18.  Defendant

provided her with a dress, and M.S. began working for him as a prostitute that night. M.S. Grand Jury Test. at 18. Defendant admitted that he prostituted M.S. from approximately May 17, 2009, through May 30, 2009, or approximately fourteen days. SOF ¶ 3.

M.S. testified that on the first night she worked for defendant, she had three "dates" in which she performed oral sex, earning $200. M.S. Grand Jury Test. at 22. M.S. further testified that she worked every day of the two weeks that she lived with defendant. M.S. Grand Jury Test. at 23. She testified that the most number of "dates" she had per night was "six or seven," and the fewest was three. M.S. Grand Jury Test. at 24. She was directed to charge $100 for intercourse and $80 for oral sex. M.S. Grand Jury Test. at 10. M.S. further testified that she performed both intercourse and oral sex, and, on one occasion, anal sex, for which she was paid $200. M.S. Grand Jury Test. at 25. Finally, M.S. testified that she had to meet a "quota" of $500 per night, although she did not testify that she made this quota every night. M.S. Grand Jury Test. at 29. M.S. testified that defendant threatened to kill her if she did not turn over all of her earnings to him. M.S. Grand Jury Test. at 23. In exchange, defendant provided M.S. with marijuana every day during the two weeks that she worked for him, M.S. Grand Jury Test. at 27, and also gave her clothing and paid for

her to have her hair and nails done, M.S. Grand Jury Test. at 29.

M.S. testified that, in addition to working for him, defendant forced her to have sex with him four or five times each day over the two week period. M.S. Grand Jury Test. at 25-26. M.S. further testified that defendant physically forced her to snort heroin against her will by holding her neck on two occasions. M.S. Grand Jury Test. at 28.

### iv.  Victim A.L.

A.L. testified before the grand jury that she was introduced to defendant by M.S., whom she met after running away from a residential placement. A.L. Grand Jury Test. at 5-6. A.L. was fourteen years old at the time. SOF ¶ 4. Defendant brought A.L. to his house and explained the "rules" to her, including what to say to potential clients, how much to charge, and how to deal with police and other pimps. A.L. Grand Jury Test. at 7, 11-13. A.L. began working for defendant as a prostitute on the first night she met him. A.L. Grand Jury Test. at 16. Defendant admitted that he prostituted A.L. from approximately May 27, 2009 through May 30, 2009, or approximately four days. SOF ¶ 4.

According to A.L., defendant drove her to the "track," along with M.S., and he remained in the area while they worked. A.L. Grand Jury Test. at 17, 19. A.L. testified that she had four "dates" on her first night working for defendant, in which she performed oral sex at the rate of $60-80. A.L. Grand Jury Test.

at 19.  A.L. also testified that she had three dates on her second night, in which she had both oral sex and intercourse at the rate of $60-80 for oral sex and $100 for intercourse.  A.L. Grand Jury Test. at 26.  A.L. testified that she turned over all of the money she earned to defendant.  A.L. Grand Jury Test. at 19, 26.  In exchange, defendant provided A.L. with "whatever [she] needed."  A.L. Grand Jury Test. at 12.  On her final night working for defendant, A.L. was arrested.  A.L. Grand Jury Test. at 27.

A.L. testified that, in addition to working for defendant, on one occasion defendant handcuffed her and tied her feet, against her will, and forced A.L. to have sex with him.  A.L. Grand Jury Test. at 21, 23.  A.L. further testified that defendant threatened to kill her if he found out that she was younger than seventeen.[3]  A.L. Grand Jury Test. at 21-22.

### 3.    Restitution Proceedings

The government filed a sealed motion for mandatory restitution and forfeiture on September 1, 2010.  With no objection from the parties, the Court appointed a guardian ad litem ("GAL") to represent the four minor victims in all subsequent restitution proceedings.  *See* Minute Order dated Sept. 9, 2010; *see also* 18 U.S.C. § 3509(h)(1) ("The court may appoint,

---

[3]    A.L. testified that she told defendant she was seventeen, although her actual age at the time was fourteen. A.L. Grand Jury Test. at 21.

and provide reasonable compensation and payment of expenses for, a guardian ad litem for a child who was a victim of . . . a crime involving abuse or exploitation to protect the best interests of the child.").

### i. GAL's Restitution Report

Pursuant to court order, the GAL filed a sealed report containing restitution recommendations for each of the four victims. *See generally* Guardian Ad Litem's Amended Restitution Report ("GAL Rep."). In her report, the GAL indicates that she was able to meet with all four victims at least once, as well as with other "collaterals" including attorneys, other guardians ad litem, probation officers, social workers, therapists, foster parents, and birth mothers. GAL Rep. at 3. The GAL also notes that she contracted the services of a licensed psychologist, Dr. C. David Missar, to assess the mental health functioning of each of the victims. GAL Rep. at 3. Dr. Missar's evaluations are attached as exhibits to the GAL's report. *See generally* Psychological Evaluation of S.H. ("S.H. Eval."); Mental Health Assessment of A.L. ("A.L. Eval."); Mental Health Assessment of M.S. ("M.A. Eval."); Mental Health Assessment of T.S. ("T.S. Eval.").

Dr. Missar was able to meet in person with only two of the victims, S.H. and A.L. Based on his interviews with these two victims, and a review of relevant psychological records and the

victim impact statements of all four girls, Dr. Missar diagnosed
each of them with Post-Traumatic Stress Disorder ("PTSD") as a
result of their experiences with defendant.  He recommended both
short-term and long-term psychiatric treatment for each of the
victims.  According to Dr. Missar, PTSD sufferers require
lifelong care because they deal with short and long-term effects
throughout their lives.  *See, e.g.*, S.H. Eval. at 11.  In the
short-term, Dr. Missar asserts that they suffer from flashbacks,
insomnia, depression, and anxiety; over the long-term, they
develop additional problems with trust, forming relationships,
self-confidence, and self-esteem.  S.H. Eval. at 11.  Discrete
life events, such as the birth of a child or defendant's eventual
release from prison, may also renew old traumas, requiring
additional care throughout adulthood.  S.H. Eval. at 11.  Dr.
Missar's specific conclusions and recommendations for each victim
are as follows:

### a. S.H.

Dr. Missar was able to meet with S.H. to conduct a thorough
psychological evaluation, including testing.  S.H. Eval. at 1.
Based on this evaluation, Dr. Missar diagnosed S.H. with PTSD,
Attention Deficit Hyperactivity Disorder ("ADHD"), Sexual Abuse,
Bipolar Disorder, Dysthymic Disorder (*i.e.*, low self-esteem),
Reading Disorder, Mathematics Disorder, and Disorder of Written

-14-

Expression.[4]  S.H. Eval. at 10-11.  Dr. Missar testified that the PTSD diagnosis, however, specifically relates to her experiences with defendant.  Tr., Jan. 21, 2011 at 42.  While acknowledging that S.H. suffered physical and emotional abuse from an aunt prior to meeting defendant, Dr. Missar nonetheless concluded that the lifestyle of child prostitution that S.H. led for nearly three years with defendant "created tremendous additional emotional traumas for her" and, indeed, exacerbated any pre-existing conditions that she may have had.  S.H. Eval. at 11.  Accordingly, Dr. Missar recommended two years of intensive individual therapy followed by weekly therapy into adulthood, five years of group therapy, five years of family therapy, psychiatric treatment and medication (specifically Abilify, which is currently part of S.H.'s treatment regimen), and six years of tutoring.  S.H. Eval. at 11-12.

### b. A.L.

Dr. Missar was also able to meet in person with A.L., although he was unable to conduct full psychological testing. A.L. Eval. at 1.  Based on his interview with A.L. and a review of her records, Dr. Missar diagnosed A.L. with PTSD, Bipolar

---

[4]     Dr. Missar notes that S.H. was also previously diagnosed with PTSD, ADHD, Mood Disorder, and Bipolar Disorder in 2008, ████████████████████████████████████████ ██████ ████████████████████████████████████████ ████ ██████████████████ ████████████████████████ ████████████████████

Disorder, ADHD, Oppositional Defiant Disorder, Sexual Abuse,

Substance Abuse, and a learning disorder.[5] Dr. Missar testified

that the PTSD diagnosis, however, specifically relates to her

experiences with defendant. Tr., Jan. 21. 2011 at 43. While

acknowledging that A.L. suffered sexual abuse ███████████████

at a young age, as well as an unstable home life thereafter, Dr.

Missar nonetheless concluded that the lifestyle of child

prostitution that A.L. experienced with defendant caused

tremendous additional emotional traumas resulting in PTSD. A.L.

Eval. at 4. Accordingly, Dr. Missar recommended two years of

intensive individual therapy followed by a lifetime of ongoing

individual therapy, five years of group therapy, five years of

family therapy, psychiatric care and medication, and six years of

tutoring. A.L. Eval. at 5.

### c. M.S.

Dr. Missar was not able to meet in person with M.S. M.S.

Eval. at 1. He was, however, able to conduct an assessment of

her mental health on the basis of psychological records and her

victim impact statement. M.S. Eval. at 1. Dr. Missar's

---

[5]     Dr. Missar notes that A.L. had been previously
diagnosed with Bipolar Disorder, Oppositional Defiant Disorder,
and ADHD, and that she has a history of mental health issues and
psychiatric admissions, ████████████████████████████████████
███████████████████████████. A.L. Eval. at 1. She has received
various mental health services in the past ███████████████████
████████████████████████████████████████████. A.L.
Eval. at 1, 3. A.L. has not had formal schooling past the sixth
grade. A.L. Eval. at 2.

assessment of M.S. indicates that her history is "rather complex." M.S. Eval. at 2. In 2005, M.S. was removed from her mother's care, along with her brother, ████████████████ ██████████████████████. M.S. Eval. at 2. M.S.'s background records further indicate that she has suffered from psychotic symptoms and mood instability and was hospitalized on several occasions for suicidal impulses. M.S. Eval. at 2. M.S. has previous diagnoses of Bipolar Disorder and ADHD, as well as Borderline Intellectual Functioning and a learning disorder, *see* M.S. Eval. at 2, although she reports having completed the tenth grade. M.S. Grand Jury Test. at 3. She also has a reported history of self-harming, including head banging and cutting, and was reportedly sexually abused by a cousin and while in foster care. M.S. Eval. at 2. Nonetheless, Dr. Missar concluded that the lifestyle of child prostitution that M.S. led with defendant created tremendous additional emotional traumas for M.S., resulting in PTSD. M.S. Eval. at 3.

Based on these records, Dr. Missar diagnosed M.S. with PTSD, ADHD, Sexual Abuse, Mood Disorder, and Impulse Control Disorder. M.S. Eval. at 3. Dr. Missar testified that the PTSD diagnosis, however, specifically relates to her experiences with defendant. Tr., Jan. 21, 2011 at 43. For M.S., Dr. Missar recommended two years of intensive individual therapy followed by a lifetime of ongoing individual therapy, five years of group therapy, five

-17-

years of family therapy, and psychiatric care and medication (specifically, Trazodone and Abilify).  M.S. Eval. at 3-4.

### d. T.S.

As with M.S., Dr. Missar was not able to meet with T.S. in person; he therefore conducted an assessment of her mental health based on her psychological records and her victim impact statement.  T.S. Eval. at 1.  Dr. Missar's assessment of T.S. notes that "little was available in the records on T.S. prior to her involvement" with defendant.[6]  T.S. Eval. at 1.  After being removed from defendant's home, T.S. was placed at a residential treatment facility where she was diagnosed with PTSD, Polysubstance Dependence, Oppositional Defiant Disorder, and Reading and Mathematics Disorders.  T.S. Eval. at 2.  Based on these records, Dr. Missar diagnosed T.S. with PTSD, Sexual Abuse, Physical Abuse, Oppositional Defiant Disorder, Polysubstance Dependence, and Reading and Mathematics Disorders.  T.S. Eval. at 2-3.  Dr. Missar testified that the PTSD diagnosis, however, specifically relates to her experiences with defendant.  Tr., Jan. 21., 2011 at 43.  For T.S., Dr. Missar recommended two years

---

[6]     However, one of the medical reports Dr. Missar considered indicates that prior to her association with defendant T.S. engaged in behaviors such as drug use, promiscuity, and self-harming.  T.S. further testified that she was raped by a 26-year-old man when she was eleven years old.  T.S. Grand Jury Test. at 6.

of intensive individual therapy followed by a lifetime of ongoing individual therapy, five years of group therapy, five years of family therapy, psychiatric care, and six years of tutoring. T.S. Eval. at 4.

Based on her own assessment and Dr. Missar's recommendations, the GAL requests additional restitution for each of the four minor victims for the costs of future psychological treatment for PTSD, tutoring expenses, and attorney fees. GAL Rep. at 9-10.

### ii. Restitution Hearing

Pursuant to 18 U.S.C. § 3664(d)(5), the Court conducted evidentiary hearings on January 21, 2011 and February 3, 2011 to determine a final restitution amount in light of the government's motion and the GAL's report.[7] The Court qualified Dr. Missar as an expert for the purpose of these proceedings, Tr., Jan. 21, 2011 at 20, and heard testimony from him as well as arguments from counsel. The Court also granted the parties an opportunity

---

[7] Section 3664(d)(5) provides that "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." An initial restitution hearing was held in this case within 90 days of defendant's November 1, 2010 sentencing date, on January 21, 2011. Due to the Court's participation in an ongoing trial, the parties agreed to waive the 90-day deadline and to continue the remaining restitution proceedings until February 3, 2011. Tr., Jan. 21, 2011, at 76, 81.

to submit supplemental briefs following the final restitution hearing.

At the restitution hearings, Dr. Missar testified that defendant is responsible for the PTSD diagnosis for each of the four victims:

> THE WITNESS: In my opinion . . . the behavior of [defendant] toward the girls, the forced prostitution, the quotas they described, the – having sexual intercourse with him prior to, to be tested out, so to speak, for the streets, the threats that they received from him both verbally and physically that they described, and then the trauma that they sustained on the streets as a result of being in threatening situations, being in sexual situations, that entire circumstance created the posttraumatic stress issues that I believe are the most significant cause of the mental health issues that I'm seeing in them at present.

Tr., Jan. 21, 2011 at 56. Dr. Missar further testified that the treatment he recommended for each of the four victims is specifically related to this diagnosis of PTSD. Tr., Jan. 21, 2011 at 61-62.

The doctor conceded that all four victims would likely have needed psychological care even if defendant had never entered their lives. Tr., Jan. 21, 2011 at 62. He also acknowledged that it is all but impossible to parse apart treatment for one condition from treatment for another condition, such that any treatment these victims receive for PTSD may encompass other psychological conditions that are unrelated to defendant. Tr., Jan. 21, 2011 at 51 (noting that "you can't just treat one

condition in isolation"). However, Dr. Missar was able to
testify, to a reasonable degree of psychological certainty, that
even if these victims had suffered no prior sexual and/or
physical abuse and notwithstanding any pre-existing psychological
disorders, their experiences with defendant would still cross a
threshold for PTSD. Tr., Jan. 21, 2011 at 55. Finally, Dr.
Missar testified that a diagnosis of PTSD requires a lifetime of
care because of the severity and the nature of the trauma
experienced, regardless of the length of time over which that
trauma occurred. Tr., Jan. 21, 2011 at 47 ("[T]here are multiple
time periods over the course of a life of a survivor of trauma
such as these girls sustained that is likely to re-traumatize and
– and re-evoke some of these feelings. So, simply saying five
years of therapy and then, you know, they should be all done,
really does a disservice to the long-term nature of what a
psychological trauma of the severity that these girls sustained,
in my opinion, is – is likely to result in emotionally.").[8]

---

[8]    *See also* Tr., Jan. 21, 2011 at 50 ("THE WITNESS: . . .
[I]f one were in the military and were dropped into a fire fight
in the middle of Afghanistan and were injured on day four . . .
whereas someone else was there . . . till year four and then
received the same injury that the other one received on day four
– THE COURT: Or until four days before that person left after
having been there four years. THE WITNESS: Correct, they still
saw blood, guts, exploding body parts, all sorts of other things.
One saw it for a more sustained period of time, but the
psychological impact of the trauma of those first four days
solidified it in both. It was just the other one happened to be
lucky or unlucky enough to have been there for those extra number
of years and just sort of piled on top of that.").

**B.  Statutory Background**

18 U.S.C. § 1593 provides that the Court "shall order restitution for any offense under this chapter [18 U.S.C. §§ 1581 *et seq.*]." An order of mandatory restitution under this provision "shall direct the defendant to pay the victim . . . the full amount of the victim's losses." 18 U.S.C. § 1593(b)(1).

In determining the "full amount of the victim's losses," the Court shall include "any costs incurred by the victim for – (A) medical services relating to physical, psychiatric, or psychological care; (B) physical and occupational therapy or rehabilitation; (C) necessary transportation, temporary housing, and child care expenses; (D) lost income; (E) attorney's fees, as well as other costs incurred; and (F) any other losses suffered by the victim as a proximate result of the offense." 18 U.S.C. § 1593(b)(3) (incorporating by reference 18 U.S.C. § 2259(b)(3)). "Although the breadth of this statutory language is circumscribed by a requirement of 'a causal connection between the offense of conviction and the victim's harm' . . . [appellate courts] addressing restitution orders under Section 2259 have not imposed a requirement of causation approaching mathematical precision." *United States v. Doe*, 488 F.3d 1154, 1159-60 (9th Cir. 2007) (internal citations omitted).

In addition, the Court shall also include "the greater of the gross income or value to the defendant of the victim's

services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. § 1593(b)(3); *see also United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1164 (9th Cir. 2010) ("[T]he Trafficking Act mandates restitution that includes a defendant's ill-gotten gains."); *United States v. Mammedov*, 304 Fed. Appx. 922, 927 (2d Cir. 2008) ("[T]he express terms of 18 U.S.C. § 1593 require that the victims in this case, *i.e.*, persons who engaged in commercial sex acts within the meaning of 18 U.S.C. § 1591, receive restitution, notwithstanding that their earnings came from illegal conduct.").

An order of restitution under this provision is issued and enforced in accordance with procedures set out in 18 U.S.C. § 3664, in the same manner as an order under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. 18 U.S.C. § 1593(b)(2). As such, "[t]he court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the Government." *Id.* § 3664(e).

A restitution order "may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." *Id.* § 3664(f)(3)(B). The defendant bears the burden of demonstrating his financial resources. *Id.* § 3664(e).

Pursuant to 18 U.S.C. § 1594(d), forfeiture of the proceeds of sex trafficking of children is also mandatory. Section 1594(d) provides:

> The Court, in imposing sentence on any person convicted of a violation in this chapter, shall order . . . that such person shall forfeit to the United States –
>
> (1) such person's interest in any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of such violation; and
>
> (2) any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

The D.C. Circuit has recognized that a money judgment is appropriate where the government is entitled to criminal forfeiture, even where the amount of the judgment exceeds the defendant's assets. *United States v. Day*, 524 F.3d 1361, 1378 (D.C. Cir. 2006).

## II. ANALYSIS

The government seeks mandatory restitution in the following amounts: (1) $577,500 for T.S.; (2) $395,800 for S.H.; (3) $860 for A.L.; and (4) $6,700 for M.S. Gov't Mot. at 9. These amounts reflect the government's calculation of the gross income to defendant from the victims' services, pursuant to 18 U.S.C. § 1593(b)(3).[9] The government also seeks mandatory forfeiture in the amount of $980,860, which reflects the government's calculation of the total proceeds from defendant's criminal activity, pursuant to 18 U.S.C. § 1594(d)(2). Gov't Mot. at 9.

In her sealed report, the GAL requests total restitution for each of the four minor victims in the following amounts: (1) $1,122,925 for T.S.; (2) $1,398,525 for S.H.; (3) $685,525 for A.L.; and (4) $871,825 for M.S. GAL Rep. at 9-10. These amounts reflect not only the gross income to defendant from the

---

[9]     In a supplemental memorandum filed under seal with the Court on the day of the final restitution hearing, the government also requested restitution for *future* lost wages for each of the four victims, pursuant to 18 U.S.C. § 2259(b)(3). Memorandum of Law Regarding Restitution for Full Amount of Victims' Losses ("Gov't Supp. Mem.") at 12-13. The government does not, however, provide an estimate of future lost wages for any of the four victims, but instead notes that "because very few courts have analyzed the question of future lost income in the context of restitution to the victim of a child exploitation offense, there is a trend . . . for courts to impose broader restitution, including imposition of restitution for future lost income." Gov't Supp. Mem. at 12-13. Without more guidance, this Court finds that the government has not sustained its burden to prove future lost income and, therefore, will not award restitution for future lost wages.

victims' services,[10] but also the estimated costs of future treatment for PTSD, tutoring expenses, and attorney fees,[11] pursuant to 18 U.S.C. § 2259(b)(3).

Defendant concedes that restitution is mandatory for each of the four victims in this case. Defendant's Response to Government's Memorandum of Law Regarding Restitution for Full Amount of Victim's Losses ("Def. Supp. Resp.") at 1. Moreover, defendant does not appear to contest that the four victims would be entitled to restitution of the proceeds from their services and for the costs of future psychological treatment if the victims' losses could be proven to be attributable to him. Defendant contends, however, that the government has not met its burden to show, by a preponderance of the evidence, that any of the losses suffered by the four victims are attributable to defendant. *See* Def. Supp. Resp. at 2-3 (citing *United States v.*

---

[10]    At oral argument, the GAL noted that the government's calculations of defendant's ill-gotten gains are generally more accurate for each of the four victims, and requested that any discrepancies be reconciled in favor of the government's calculations. As such, the Court will rely on the government's calculations of the gross income to defendant from the victims' services.

[11]    In her restitution report, the GAL originally requested $8,500 in attorney fees, allocated equally among the four victims, *see* GAL Rep. at 9-10, but she indicated that this calculation of attorney fees would need to be updated at the conclusion of the restitution proceedings. GAL Rep. at 9-10 nn.2-5. On March 24, 2011, the GAL filed under seal with the Court an updated request for $14,230.06 in attorney fees and expenses.

*Monzel*, No. 09-cr-243, Restitution Order at 3 (D.D.C. Jan. 11, 2011) ("Before ordering any restitution amount, the Court 'must be able to ascertain with reasonable certainty from the evidence presented what proportion of the total harm was proximately caused by this defendant and this offense.'" (internal citations omitted))). Particularly, defendant contends that because each of these four victims would likely need psychological care as a result of conditions that pre-date their experiences with defendant, *see* Def. Supp. Resp. at 3, it is impossible to attribute a specific dollar amount of future treatment expenses to defendant's criminal activity. Def. Supp. Resp. at 4. As such, defendant asserts that this Court can award no more than a nominal amount of restitution to any of the victims. Def. Supp. Resp. at 9.

The Court notes that what little guidance exists from other courts in determining restitution awards arises primarily in the context of child pornography. Many courts have elected to award only nominal damages in cases dealing with possession of child pornography, although there appears to be no consistent approach among the courts as to what "nominal" means. *See, e.g.*, *Monzel*, No. 09-cr-243, Restitution Order at 4 (noting that "[t]he nominal amounts ordered by district courts throughout the country have varied greatly"). Here, defendant contends that nominal damages are similarly appropriate and, indeed, "the amount should be less

than that awarded in child pornography cases" because "victims of child pornography continue to suffer emotional harm . . . as long as the pornography remains accessible." Def. Supp. Resp. at 9.

While this Court declines to draw conclusions about whether there is a hierarchy of harm between child pornography and child prostitution, the Court finds this case to be meaningfully distinguishable from the long line of child pornography restitution cases. In those cases, courts have awarded nominal damages because they could identify no rational, evidence-based procedure for ascertaining the dollar value of the harm suffered by the victim as a result of a particular defendant's possession of pornographic images, given that there are numerous defendants causing the victim the same type of harm. *See, e.g., United States v. Church*, 701 F. Supp. 2d 814, 832 (W.D. Va. 2010). Here, by contrast, the trauma personally inflicted on each victim by defendant is clear and undeniable.

Specifically, defendant has admitted that he prostituted each of these minor victims for his benefit, some for years of their lives. The evidence in this case demonstrates that defendant targeted these girls, picking them up at bus stops or on the side of the road and enticing them with money, drugs, and an offer of security. Each victim testified that defendant brought her into his home, taught her the "rules" of prostitution, provided her with clothes to dress for the streets,

drove her to the "track," kept watch over her while she worked, and demanded that she turn over her proceeds to him. The evidence further demonstrates that defendant indoctrinated these girls into a life of prostitution such that some would even act on his behalf by bringing new girls in, coaching them, and collecting their money to turn over to defendant. The minor victims also testified that defendant manipulated them with threats and inflicted violence on them. Each of the minor victims further testified that defendant had sex with them – often against their will – sometimes as frequently as five times a day. Accordingly, the Court finds that there is ample evidence in the record demonstrating that defendant was no mere casual participant in the exploitation of these four victims. Indeed, to the contrary, the Court finds that defendant personally caused each of the child victims severe physical, emotional, and mental harm.

In sum, having carefully considered the parties' arguments, the GAL Report, the testimony of Dr. Missar, and the applicable law, the Court concludes that the government has met its burden to prove the full amount of losses for all four minor victims and that these losses are attributable to defendant. The Court further finds that no attorney fees are attributable to defendant. The Court further concludes that the government has met its burden to prove the amount of defendant's proceeds from

his offenses, for the purposes of a forfeiture money judgment. Finally, the Court concludes that defendant does not have the ability to pay any restitution or forfeiture amount and, therefore, shall make regular nominal payments in satisfaction of the financial obligations set out in this Memorandum Opinion. In support of these conclusions, the Court finds as follows:

**A. Victim S.H.**

For S.H., the government seeks restitution in the amount of $849,400 for the costs of future psychological treatment for PTSD (including medication) and tutoring, GAL Rep. at 10, as well as $395,800 in restitution for the value of her services to defendant, Gov't Mot. at 7.

With respect to ill-gotten gains, the record supports a reasonably certain estimate of S.H.'s losses, although it does not support a calculation of those losses with any mathematical precision. The Court is persuaded that S.H. is entitled to restitution for the value of her services to defendant, which may be calculated as follows: $400 x 914.[12] The preponderance of the evidence demonstrates that S.H. is entitled to restitution in the

---

[12]     The Court's calculation represents the average daily amount S.H. testified that she earned over the period of time she worked for defendant (between $300 and $500), *see* S.H. Grand Jury Test. at 33, multiplied by the number of days defendant admitted that he prostituted her. Based on the Statement of Facts, which defendant stipulated to as part of his plea agreement, defendant prostituted S.H. for 914 days. SOF ¶ 1.

amount of $365,600 for the value of the services she provided
defendant over the years she worked for him.

With respect to psychological costs and tutoring expenses,
the Court is persuaded that the government has met its burden to
demonstrate that the full amount of S.H.'s losses is attributable
to defendant.  The Court finds credible Dr. Missar's diagnosis of
PTSD for S.H., and it accepts Dr. Missar's estimate of the short-
and long-term care needed to treat this condition.

Accordingly, the Court orders defendant to pay restitution
to S.H. in the amount of $365,600 for ill-gotten gains and
$849,400 for the costs of future psychological treatment and
tutoring, for a total of $1,215,000.

**B. Victim T.S.**

For T.S., the government seeks restitution in the amount of
$573,800[13] for the costs of future psychological treatment for
PTSD (including medications) and tutoring expenses, GAL Rep. at
9, as well as $577,500 in restitution for defendant's "ill-gotten
gains" from her services, Gov't Mot. at 6.

With respect to ill-gotten gains, the record reasonably
supports a specific calculation of T.S.'s losses.[14]  The Court

---

[13]    Although the GAL's report states that the total amount
of psychological treatment expenses requested for T.S. is
$849,400, the specific figures provided for each type of
treatment actually total to $573,800.

[14]    The Court notes that T.S. also testified that she
"started keeping money after a period of time."  T.S. Grand Jury

calculates defendant's ill-gotten gains from services performed by T.S. as follows: $500 x 1155.[15] The preponderance of the evidence demonstrates that T.S. is entitled to restitution in the amount of $577,500 for the value of the services she provided defendant over the three years she worked for him.

With respect to psychological treatment and tutoring costs, the Court finds that the government met its burden to prove that the full amount of T.S.'s losses is attributable to defendant. The Court finds credible Dr. Missar's diagnosis of PTSD for T.S., and it accepts Dr. Missar's estimate of the short- and long-term care needed to treat this condition.

Accordingly, the Court orders defendant to pay restitution to T.S. in the amount of $577,500 for ill-gotten gains and $573,800 for the costs of future psychological treatment and tutoring, totaling $1,151,300.

---

Test. at 15. The Court is persuaded, however, that restitution must be awarded in the amount of the defendant's gross, rather than net, proceeds. *See* 18 U.S.C. § 1593(b)(3).

[15] The Court's calculation represents the $500 daily quota T.S. testified she was required to meet for defendant, *see* T.S. Grand Jury Test. at 12, multiplied by the total number of days defendant admitted that he prostituted T.S., less the four days that T.S. testified that she failed to meet her $500 quota, *see* T.S. Grand Jury Test. at 13. Based on the Statement of Facts, which defendant stipulated to as part of his plea agreement, defendant prostituted T.S. for 1159 days. SOF ¶ 2.

## C. Victim M.S.

For M.S., the government seeks restitution in the amount of $839,700 for the costs of future psychological treatment for PTSD (including medications), GAL Rep. at 10, as well as $6,700 in restitution for defendant's "ill-gotten gains" from M.S.'s services, Gov't Mem. at 8.

With respect to ill-gotten gains, the record reasonably supports a specific calculation of M.S.'s losses. The Court calculates defendant's ill-gotten gains from services performed by M.S. as follows: $200 + (13 x $405).[16] The preponderance of the evidence demonstrates the M.S. is entitled to restitution in the amount of $5,465 for the value of the services she provided defendant.

With respect to psychological treatment, the Court finds that the government met its burden to prove that the full amount of M.S.'s losses is attributable to defendant. The Court finds credible Dr. Missar's diagnosis of PTSD for M.S., and it accepts

---

[16]     M.S. testified that she was required to meet a quota of at least $500 per night for defendant. M.S. Grand Jury Test. at 29. However, because M.S. did not testify that she actually met her $500 quota every night, the Court's calculation represents: (1) the amount M.S. testified that she made her first night of working for defendant ($200), *see* M.S. Grand Jury Test. at 22; added to (2) the average number of "dates" M.S. testified that she had over the next thirteen days (between three and six per day), *see* M.S. Grand Jury Test. at 24, multiplied by the average of the amounts she testified that she charged (between $80 and $100), *see* M.S. Grand Jury Test. at 10.

Dr. Missar's estimate of the short- and long-term care needed to treat this condition.

Accordingly, the Court orders defendant to pay restitution to M.S. in the amount of $5,465 for ill-gotten gains and $839,700 for the costs of future psychological treatment, for a total of $845,165.

### D. Victim A.L.

For A.L., the government seeks restitution in the amount of $679,800 for future psychological treatment for PTSD and tutoring costs, GAL Rep. at 10, as well as $860 in restitution for defendant's "ill-gotten gains" from A.L.'s services, Gov't Mot. at 8.

With respect to ill-gotten gains, the record reasonably supports a specific calculation of A.L.'s losses. The Court calculates defendant's ill-gotten gains from services performed by A.L. as follows: (4 x $70) + (3 x $170).[17] The preponderance of the evidence demonstrates that A.L. is entitled to restitution in the amount of $790 for the value of her services to defendant.

With respect to psychological treatment and tutoring costs,

---

[17] The Court's calculation represents: (1) the average of the amounts A.L. testified that she charged for each of the four "dates" she had on her first night working for defendant (between $60 and $80), see A.L. Grand Jury Test. at 19; added to (2) the amount A.L. testified that she charged for each of the three "dates" she had on her second night working for defendant (performing both intercourse, at $100, and oral sex, at between $60 and $80), see A.L. Grand Jury Test. at 26.

the Court finds that the government met its burden to prove that the full amount of A.L.'s losses is attributable to defendant. The Court finds credible Dr. Missar's diagnosis of PTSD for A.L., and it accepts Dr. Missar's estimate of the short- and long-term care needed to treat this condition.

Accordingly, the Court orders defendant to pay restitution to A.L. in the amount of $790 for ill-gotten gains and $679,800 for the costs of future psychological treatment and tutoring, for a total of $680,590.

### E. Attorney Fees

Pursuant to 18 U.S.C. § 2259(b)(3)(E), the GAL seeks additional restitution for attorney fees, representing her work on behalf of the four minor victims in this action. GAL Rep. at 9-10. The Court finds that these attorney fees are not attributable to defendant and, therefore, denies the GAL's request to include them in the Court's restitution order.[18]

---

[18] When the Court appointed the GAL in this action, it anticipated being able to provide her with "reasonable compensation" pursuant to 18 U.S.C. § 3509(h)(1). The Court was subsequently informed, however, that despite the fact that Congress amended § 3509(h)(1) on July 27, 2006 to expressly authorize the courts to compensate guardians ad litem in cases of child sexual abuse, see Adam Walsh Child Protection and Safety Act of 2006, P.L. 109-248, Title V, § 507 (2006), there was no source of dedicated funding to pay for such an appointment. When the Court informed the GAL of this unexpected development, she graciously volunteered to continue to represent the minor victims in this case in a pro bono capacity, and the Court is grateful for her service. The Court feels compelled to reiterate its frustration regarding its inability to provide compensation to individuals charged with the extremely important task of

## F. Forfeiture

In addition to restitution, the government has moved for mandatory forfeiture pursuant to 18 U.S.C. § 1594(d). Because the government claims it has been unable to trace the proceeds from the offenses defendant committed, the government contends that the Court must assess a money judgment against defendant reflecting the total amount he gained from the victims' labors, which they calculate to be $980,860. Gov't Mot. at 5.

Defendant does not appear to contest that the government is entitled to forfeiture, but he objects to the amount sought on the basis that there is no "reliable proof before the Court to justify the amount requested." Defendant's Response to Government's Motion for Restitution and Forfeiture ("Def. Resp.") at 10. As set forth above, however, this Court has found that the government met its burden to prove the total value of the victims' services to defendant. Therefore, pursuant to 18 U.S.C. § 1594(d)(2), the Court orders defendant to pay a money judgment of $949,355, representing the total amount of defendant's ill-gotten gains from the victims' services. This amount shall be reduced by the value of the property that has already been administratively forfeited, which defendant has estimated at

---

representing the interests of victims of child sexual exploitation and to express its hope that Congress will provide the courts with the necessary funding to implement this important statutory provision.

approximately $12,045, for a total of $937,310.[19] Def. Resp. at 8. The Court further orders forfeiture of defendant's remaining assets in partial satisfaction of this money judgment.

### G. Ability to Pay

18 U.S.C. § 3664(f)(3)(B) provides that a restitution order "may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." Defendant urges the Court to require only nominal periodic payments in satisfaction of any restitution order. The Court finds that this approach is warranted, based on the facts in the record.

Defendant asserts that his reported adjusted gross income for the past three years was $7,343, $12,002, and $9,835. Def. Resp. at 9-10. He has debt totaling $1,870 for unpaid medical and Verizon bills, which are in collection status. Def. Resp. at 9. Presentencing materials filed in this case confirm these figures. Presentence Investigation Report, Doc. No. 22 at 14-15.

------

[19]     Defendant indicates that each of the two forfeited vehicles is worth approximately $6,000 according to Kelley Blue Book. Def. Resp. at 8. The pistol has a value of approximately $30-60. Def. Resp. at 8. Taking the average approximate value of the pistol, the total value of these forfeited assets equals $12,045.

Defendant's remaining assets consist of some antique coins, miscellaneous knives, and $462 in cash. Def. Resp. at 8. There is no indication that defendant owns any assets other than those that have been administratively forfeited.

On the basis of these facts, this Court finds that defendant does not have the financial ability to pay any amount of restitution other than nominal periodic payments.

## III. CONCLUSION

For the foregoing reasons, the government's motion for mandatory restitution and forfeiture is hereby **GRANTED**. An Order consistent with this Memorandum Opinion will be entered this same day.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
              **United States District Judge**
              **March 30, 2011**